UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sukhwinder Singh, and Dharam Singh<br><br>Plaintiffs,<br><br>v.<br><br>Hillary Rodham Clinton, et al,<br><br>Defendants.<br>_____/ | No. C 08-2362 WDB<br><br>**ORDER AND MEMORANDUM OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiff Sukhwinder Singh is from the Punjab region of India. In 1988 his brother Dharam Singh, living in and having become a citizen of the United States, filed a form I-130 petition with the Immigration and Naturalization Service[1] asserting that Mr. Singh is his brother and seeking an adjudication of Mr. Singh's "relative" status.[2] Dharam enlisted an attorney, Gordon Quan, to assist with the I-130 petition. The INS approved the petition, thus rendering Mr. Singh eligible to apply for a visa to immigrate to the United States.

---

[1] Since that time the INS's functions have been transferred to the Department of Homeland Security. Visa matters are now coordinated within the United States Citizenship and Immigration Service ("USCIS").

[2] We use "Mr. Singh" to refer to Sukhwinder Singh, the person seeking to immigrate to the United States. We will refer to his brother as "Dharam Singh."

1

1  The government contends that it sent Mr. Singh various notifications relating to the process of applying for a visa, that Mr. Singh never pursued his application for a visa, and that, in accordance with the governing statute and relevant regulations, the government "terminated" Mr. Singh's "registration" with the New Delhi consulate and "revoked" the I-130 petition for failure to pursue a visa within the specific period.  As discussed, *infra*, the government appears to have sent the requisite form notices to Gordon Quan's office, the attorney who filed the I-130.

Mr. Singh asserts that he never received any of the requisite notifications, that the government was required to send them to him directly, not to Mr. Quan, and, as a result, that the government's termination of his registration and revocation of his I-130 petition were without proper notice and, therefore, were arbitrary and capricious.

On January 30, 2009, the parties filed cross motions for summary judgment. Plaintiffs ask the Court to find that the evidence demonstrates as a matter of law that the government's conduct was arbitrary and capricious.  The government contends that the Court does not have jurisdiction to review the consulate's decision terminating the registration and revoking the petition.  In the alternative, the government argues that no reasonable trier of fact could find that the consulate's conduct was arbitrary and capricious and asks the Court to enter judgment against plaintiffs and in favor of the government.

On March 4, 2009, the Court conducted a hearing in connection with the parties' motions.  For the reasons stated below, the Court RULES that it has jurisdiction to review the government's action in this case.  Additionally, the Court DENIES Plaintiffs' Motion for Summary Judgment and GRANTS defendants' Motion for Summary Judgment in its entirety.

//

//

# DISCUSSION

## I. Doctrine of Consulate Nonreviewability

Defendants contend that this Court lacks jurisdiction to decide plaintiffs' claim because the government action that plaintiffs challenge is committed to the discretion of the consulate's office. Defendants' Motion at 8. As a general matter, a consulate officer's decision whether to grant or deny a visa petition is not subject to judicial review. However, Ninth Circuit case law undermines the application of that rule in a case such as this.

The Ninth Circuit has held that the courts have jurisdiction to decide a lawsuit challenging the authority of the consulate to take action where that action is not a matter subject to the consulate officer's discretion. *Patel v. Reno*, 134 F.3d 929 (9th Cir. 1998). Additionally, the Ninth Circuit previously has reviewed the revocation of a non-immigrant visa where the government's action was based on a procedural deficiency that was not one of the enumerated bases for revocation set forth in the governing regulations. *Wong v. Dept. of State*, 789 F.2d 1380 (9th Cir. 1986).

Mr. Singh does not challenge a decision to grant or to deny him a visa. Instead, he challenges the federal agency's termination of his "registration" to apply for a visa and the automatic revocation of his status as Dharam's "relative" (for purposes of applying for a visa). In rescinding his "registration," the agency was not purporting to act on the merits of an application for a visa -- but was withdrawing a designation that would have enabled Mr. Singh (when his priority date finally arrived) to file an application for a visa. Mr. Singh contends that in withdrawing or rescinding his "registration" the agency violated procedural mandates imposed by Congress and reflected in regulations and a policy manual adopted by the agency. Thus, the core predicate for the challenge that the plaintiffs

press here is procedural: an alleged failure to follow legally mandated procedures en route to the withdrawal of the "registration."

The consulate's withdrawal of Mr. Singh's registration did not involve an exercise of discretion. The relevant regulations require the consulate to terminate an alien's registration, automatically, where the applicant has not pursued his visa application within one year after the agency sent out notice of the availability of a visa and has not demonstrated that the failure to pursue the application was beyond his control. 8 U.S.C. §1153(g); 22 C.F.R. §42.83(a) and (c). Approval of an alien's I-130 Petition is automatically revoked when the alien's registration is terminated. 8 C.F.R. §205.1.

Mr. Singh does not ask the Court to tell the consulate how to rule on his visa. The Court is required only to determine whether the agency followed the procedures it was required to follow.

The Court RULES that it has jurisdiction to review the agency action at issue in this case.

## II.  Standard on Summary Judgment

To succeed on a motion for summary judgment, the moving party must establish that, under facts that are not subject to genuine dispute, that party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c). In reviewing a motion for summary judgment, the Court considers the evidence in the light most favorable to the party against whom the judgment is sought.

Stated in lay terms, a motion for summary judgment by defendants is a request to the Court for a ruling that, even if we consider the evidence in the best possible light for plaintiffs, the evidence is insufficient (as a matter of law) to support a finding by the trier of fact that plaintiffs have proved all required elements of their claims. If the Court grants defendants' motion, plaintiffs are not

entitled to proceed to a trial -- and the Court must enter judgment in defendants' favor.

### III. Review of agency action under the APA

Under authorities by which we are strictly bound, judicial review of agency conduct of the kind challenged here must be extremely deferential. Under the Administrative Procedure Act, a court may overturn non-discretionary agency action only if the challengers prove that the action was "arbitrary, capricious . . . [or] not in accordance with law . . . ." 5 U.S.C. §706(2)(A). An agency's action may be deemed arbitrary or capricious if, in taking that action, the agency violated clearly applicable procedural requirements that are essential to achieving ends mandated by Congress. *See, e.g., U.S. v. District Council of New York City, et al*, 880 F. Supp. 1051 (S.D. N.Y. 1995); *Bunyard v. Hodel*, 702 F.Supp. 820 (D. NV. 1988).

In the case at bar, plaintiffs contend that the agency violated a requirement (mandated by statute and regulation) that certain notices be sent "to the alien." More specifically, plaintiffs contend that the phrases "notification to the alien" and "notify the alien" can have only one rational meaning and that the agency's decisions to send notices to counsel instead of directly to Mr. Singh's last known address were transparently inconsistent with that one meaning.

When reviewing an agency's interpretation of a statute the Court first must determine whether Congress has directly spoken on the question presented. *Chevron v. Natural Resources Defense Counsel, et al*, 467 U.S. 837 (1984). If

//
//
//
//

5

Congress has so spoken, the courts, of course, must give effect to Congress' intention. On the other hand,

> if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 843.

When reviewing an agency's interpretation of its own regulations,

> [the court ] must give substantial deference to an agency's interpretation of its own regulations. . . . Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given "'controlling weight unless it is <u>plainly erroneous or inconsistent with the regulation</u>.'" . . . In other words, we must defer to the [agency's] interpretation unless an "alternate reading is compelled by the regulation's plain language ..."

*Thomas Jefferson Univ., v. Shalala*, 512 U.S. 504, 512 (1994) emphasis added and internal citations omitted.

## IV. <u>Merits of the Parties' Cross-Motions for Summary Judgment</u>

### A. <u>The relevant statute, regulations, and "guidelines"</u>

Section 1153(g) of the Immigration and Nationality Act ("INA ") states,

> The Secretary of State shall terminate the registration of any alien who fails to apply for an immigrant visa within one year following notification <u>to the alien</u> of the availability of such visa, but the Secretary shall reinstate the registration of any such alien who establishes within two years following the date of notification of the availability of such visa that such failure to apply was due to circumstances beyond the alien's control.

INA, 8 U.S.C. §1153(g) emphasis added.

The applicable regulations provide the following.

**§42.83 Termination of registration**

> *(a) Termination following failure of applicant to apply for visa.* In accordance with INA 203(g) [1153(g)], an alien's registration for an immigrant visa shall be terminated if, within one year after transmission of a notification of the availability of an immigrant visa, the applicant fails to apply for an immigrant visa. . . .

6

> *(c) Notice of termination.* Upon the termination of registration under paragraph (a) of this section, the National Visa Center (NVC) shall notify the alien of the termination. The NVC shall also inform the alien of the right to have the registration reinstated if the alien, before the end of the second year after the missed appointment date if paragraph (a) applies, establishes to the satisfaction of the consular officer at the post where the alien is registered that the failure to apply for an immigrant visa was due to circumstances beyond the alien's control.

22 C.F.R. §42.83(a) and (c).

The Department of State's Foreign Affairs Manual ("FAM") instructs government personnel about how to implement the applicable statutory and regulatory provisions. 1 F.A.M. 011.1 (Scope); Transcript March 4, 2009, hearing. With respect to the issues before us, the FAM provides as follows.

> An applicant who has not made application within one year after the Packet 4 or Packet 4(a) letter is mailed is considered not to have made timely application for a visa and registration shall be terminated. The one-year period for calculating the date of immigrant visa registration begins on the date Packet 4 or Packet 4(a) is mailed.

9 FAM 42.83 N1.1.

> After the one-year period has ended, if the applicant is able to persuade the consular officer within the next year that the failure to appear within the first year was beyond the applicant's control, the applicant would be entitled to another appointment. Notification of the date of that appointment would also begin the running of another year for the purpose of calculating the possible date of immigrant visa registration.

9 FAM 42.83 N2.3.

> The burden is on the applicant to provide the post with a current address. Failure of an applicant to receive the notice of termination due to a change of address of which the post was not notified, will not be considered as a "reason beyond the applicant's control" for not pursuing the application.

9 FAM 42.83 N5.

Approval of an I-130 petition is automatically revoked when the Secretary of State terminates the beneficiary's registration under §1153(g). 8 C.F.R. §205.1(a)(1). When a petition is automatically revoked "the director . . . shall cause a notice of such revocation to be sent promptly to the consular office having

7

jurisdiction over the visa application and a copy of such notice to be mailed to the petitioner's last known address." 8 C.F.R. §205.1(b).  In the context of the I-130 petition that is in issue in this case, the "petitioner" would be Dharam.

See also, *Park v. Gonzales*, 450 F.Supp.2d 1153 (D. OR 2006), for an explanation of the visa petition and revocation process.

### B.     What the Evidence Shows about What Was Done

Under the evidence submitted by the parties, the following facts are not subject to genuine dispute.

Dharam Singh lives in Houston, Texas.  He enlisted an attorney, Gordon Quan, whose office also is in Houston, to help him and his brother launch the process that they hoped eventually would enable Sukhwinder to come to the United States.  On May 9, 1988, Mr. Quan and Dharam filed a Petition I-130 for Sukhwinder's benefit.[3]  That petition was approved on September 6, 1991.  Declaration of Edward A. Olsen, filed January 30, 2009, ("Olsen Decl."), at Ex. B.

Meanwhile, and independent of the I-130 process, Sukhwinder came to the United States, unlawfully, in 1990 or 1991.[4]  In September 1994, at least one arm of the federal government learned that Mr. Singh was in the United States unlawfully and initiated removal proceedings.  Mr. Singh retained a lawyer to represent him in the removal proceedings, which meandered inconclusively forward over a period of many years.

On September 4, 2000, apparently unaware of the removal proceedings, an agency of the State Department, the National Visa Center, mailed a "Packet 3" for Mr. Singh to attorney Gordon Quan's office in Houston, Texas.  Declaration of

---

[3] Mr. Quan says that he filed the I-130 petition on May 9, 1991.  Declaration of Gordon Quan, filed January 30, 2009, ("Quan Decl."), at ¶2.  It appears his records are incorrect.

[4] Mr. Singh says November 27, 1991.  Defendants say January 1, 1990.  No one contends that the dispute is material to the motions before us.

Chloe Dybdahl, filed January 30, 2009, ("Dybdahl Decl."), at ¶6.  On September 14, 2000, the National Visa Center sent Mr. Singh's petition to the United States consulate in New Delhi.[5]  Dybdahl Decl., at 7.  On October 26, 2000, for reasons that are not stated, the Visa Center also sent Packet 3 to Dharam Singh's address in Houston, Texas.  Dybdahl Decl., at 6.  It is not clear what the full extent of the information in Packet 3 was, but it might have included an indication that the Visa Center would send an additional notice before any action was required by the applicant.  It apparently was receipt of Packet 3 that led Dharam Singh, sometime before the end of the year 2000, to contact Mr. Quan and ask him to provide Sukhwinder Singh with an update about the status of the visa application process.

On September 4, 2001, the United States Embassy in New Delhi mailed a Packet 4(a) for Mr. Singh to Mr. Quan.  Dybdahl Decl., at 7.  There is no evidence that Packet 4(a) also was sent to Dharam Singh or to anyone else.  Packet 4(a) is the notification that starts the one-year clock running for purposes of when to terminate Mr. Singh's visa registration.

On September 5, 2002, the government mailed to Mr. Quan a form termination notice stating that Mr. Singh had not made his application within one year of the mailing of Packet 4(a) and, therefore, that his registration was terminated.  Dybdahl Decl., at ¶7.  This form notice advised its recipient that Mr. Singh had an additional year to present evidence that could overcome the termination and support reinstatement of the registration.

Having heard nothing from Mr. Singh for many years, or from anyone on behalf of Mr. Singh, on September 5, 2003, the government mailed to Mr. Quan the final notice of termination - automatically rescinding Mr. Singh's "registration"

---

[5] A document indicating that the Singhs' I-130 was approved indicates that the petition was sent to New Delhi in 1991 – nine years previously.  Olsen Decl., at ¶B.  For purposes of the parties' motions, it is unnecessary to resolve this factual discrepancy.

and revoking approval of the I-130 petition that had been granted in 1991. Dybdahl Decl., at ¶ 7 and 8 C.F.R. §205.1.

On September 9, 2004, pursuant to established policies, the government destroyed the petition papers. Dybdahl Decl., at ¶7; *see also*, 9 FAM 42.83 PN 5.1.

Only after the government had terminated Mr. Singh's registration and revoked his I-130 (and, apparently, in response to the government's separately initiated removal proceedings) did Mr. Singh file a form I-485, seeking to adjust his status to that of a lawful permanent resident. Olsen Decl., at Ex. B (form I-485, filed February 22, 2005). Mr. Singh asserts in these proceedings that it was through a response that the government filed in August of 2006 to his I-485 petition that he first learned that his registration had been rescinded and that the government had revoked its approval of his I-130.

### C.     **The Parties' Motions for Summary Judgment**

Plaintiffs ask the Court to rule that the government's actions terminating Mr. Singh's registration and revoking his I-130 petition were arbitrary and capricious as a matter of law because the government did not mail the requisite notices directly to the address that Mr. Singh had last provided to the Visa Center (his family's address in Punjab -- where his wife allegedly still resided, but where he had not even visited since at least 1991). The government contends that it sent notice to a lawyer whom the government reasonably believed was representing Mr. Singh and that, as a matter of law, doing so satisfied the applicable statutes and regulations that required the Center to notify the alien.[6]

---

[6] Mr. Quan indicates that he did not receive any such notices. Quan Decl., at 4. Plaintiffs do not argue that this is evidence that the notices were not in fact sent to Mr. Quan. Instead, plaintiffs argue that, even if Mr. Quan had received the notices, the notices did not satisfy the statute and regulations because sending them to Mr. Quan did not constitute notifying "the alien."

In any event, Mr. Quan's testimony indicates only that he has no record of ever receiving the notices. This testimony does not contradict directly the Dybdahl Declaration and would not permit a rational trier of fact to find that the government never sent the notices.

According to plaintiffs, the statute's directive that termination occurs "one year following notification <u>to the alien</u>" requires, by its plain language, that the government send the requisite notice directly to Mr. Singh's last known address. 8 U.S.C. §1153(g) emphasis added; see also 22 C.F.R. §42.67 and §42.87. Plaintiffs cite no authority in support of this narrow construction.

The statutory language on which plaintiffs rely does not specify <u>how</u> the agency is to notify the alien. Nor does the statute suggest that the deadlines it sets are triggered only if notice actually reaches the alien. The agency encounters visa applicants in myriad living situations. Moreover, some applicants have the assistance of lawyers; some have the assistance only of friends or relatives; some have no one's assistance. The foreseeability of the unforeseeability of the full range of circumstances in which the Visa Center would be called upon to try to reach people, and of evolving and proliferating means to achieve that end, strongly supports the inference that Congress had no intention of pre-determining which method the Center would be required to use when it sought to get notice to the interested alien.

For these same reasons, there is no reason to believe that Congress intended to require the agency to identify and use <u>only</u> the means that were most likely to achieve the end of reaching the alien. Imposing that kind of duty foreseeably would require the agency to commit massive resources to the notification effort – conducting investigations and fashioning methods on a case by case basis. Such a requirement also would expose the agency to extensive second-guessing and litigation. We cannot assume that Congress would have contemplated either of these predictable developments with equanimity.

Given that it is extremely unlikely that Congress intended to dictate <u>how</u> the agency should "notify the alien," or that the agency use <u>only</u> the method that was most likely to reach the applicant, it is safe to infer that Congress' intent was

simply to direct the agency to select means that were reasonably calculated, in the circumstances, to achieve the statutorily mandated goal of notifying the alien.

We can frame the issue presented by the parties' cross motions in this way: did the Visa Center act arbitrarily or capriciously when it interpreted the mandate to "notify the alien" to permit the Center to send notices to a lawyer in the United States who had been assisting the alien and his relatives in this country, instead of to a residence address in a foreign country that the alien had provided more than a decade earlier?  Stated with slightly more analytical precision, the issue is this: construing the evidence in the record in the light most favorable to plaintiffs, could a trier of fact rationally conclude that the agency did not have a rational basis for believing that the method it chose to notify the Mr. Singh (by sending the notices to attorney Quan) was reasonably calculated to get the message to the applicant? We think this question is virtually self answering – in the negative.

It certainly would not be clearly unreasonable for a federal agency to believe that its notices were at least as likely to reach their target if they were sent to a lawyer who had been working on behalf of the alien and who was practicing in the United States than if the notices were sent to an overseas residential address that had not been confirmed for a decade or more.  The Center could reasonably conclude that the attorney in the United States was at least as likely as the foreign applicant (1) to have a stable address or to set up a reliable system for forwarding mail to a new address, (2) to understand the content and implications of the government's notice, (3) to alert the foreign applicant (directly or through his family in the United States), and (4) to identify for the foreign applicant the responsive steps that he needed to take.  Plaintiffs identify nothing in the statute, the legislative history, or the applicable regulations and agency guidelines that would evidence an intention by the legislature to preclude the Visa Center from

seeking to "notify the alien" by sending notices to the lawyer whom the Center knew had been helping that alien.

Given this failure by plaintiffs to identify evidence that would support their view of Congress' intent, given that the method the Center selected to try to get the notices to Mr. Singh was obvious and sensible, and given the fact that there is no evidence that the Center chose a method for trying to reach the plaintiffs that was calculated to reduce the likelihood that Mr. Singh in fact would receive the notifications, we HOLD that no rational trier of fact could find that it was arbitrary or capricious for the Visa Center to conclude that it could satisfy the statutory mandate to give notice "to the alien" by sending the pertinent papers to the lawyer whom the Center knew had been assisting the alien applicant.

Plaintiffs contend that notice to Mr. Quan could not satisfy the requirement to give notice to the alien because Sukhwinder had neither retained nor entered an attorney-client relationship with Mr. Quan. Instead, plaintiffs insist, it was Dharam who retained Mr. Quan and only Dharam was Mr. Quan's client. We are not sure whose law would apply to determine whether Mr. Quan entered an attorney-client relationship with Mr. Singh (would it be the law of Texas, of Ohio, of California, or of some other jurisdiction in which Mr. Singh resided between 1988 and 2004?), but we are sure that the issue before us should not turn on what label would be attached to that relationship by state courts interpreting myriad different state laws governing professional relationships. There is no reason to believe that when it required notice be given "to the alien" Congress envisioned the Visa Center deciding, one applicant at a time, whose law would determine whether an applicant had entered an attorney-client relationship with a particular lawyer or law office, then developing an evidentiary record sufficient to determine, under the applicable principles, whether the courts of the state in question would conclude that the applicant in question was "a client" of the lawyer in question. Moreover, given

1   that there are more than fifty different sources of rules in the United States about
2   formation of an attorney-client relationship, there is no reason to assume that
3   Congress expected the courts to use these varying rules to determine whether the
4   Center had satisfied its obligation to give notice "to the alien."

5   The issue before us is not whether, under some state's law, Mr. Singh would
6   be deemed to have been one of Mr. Quan's "clients." Instead, the issue is this: did
7   the Visa Center act arbitrarily or capriciously when it concluded that the statutes
8   and regulations that required it to deliver notice "to the alien" did not prohibit the
9   Center from directing that notice to a lawyer whom the Center knew had been
10  assisting the alien? There simply is no evidentiary (or other) support for answering
11  this question in the affirmative.

12  Nor, if the question were pertinent, could a rational trier of fact conclude that
13  it was "arbitrary or capricious" for the Visa Center to conclude that Mr. Quan
14  represented Mr. Singh. It was obvious that Mr. Quan had filed the I-130 for
15  Sukhwinder's benefit, to enable him to come to the United States lawfully.
16  Moreover, there is uncontested evidence that Dharam contacted Mr. Quan some
17  time in 2000 and asked him to provide Mr. Singh with an update about the status of
18  the visa process. Quan Decl., at 3. This suggests that, as of 2000, both brothers
19  believed that Mr. Quan was still actively involved in assisting Mr. Singh to obtain
20  a visa. Given this evidence, and the circumstances, there certainly was a rational
21  basis for believing that Mr. Quan 'represented' both brothers.

22  During the hearing on these motions, plaintiffs' counsel argued that the Visa
23  Center could have met its obligation to give notice to Mr. Singh only by mailing
24  the notices to the address in Punjab, India, that he had supplied in the initial
25  petition that Mr. Quan had submitted on his behalf in 1988. Transcript March 4,
26  2009, hearing. This argument strikes us as a bit curious in light of the facts,
27  uncontested, that Mr. Singh had left India by 1991, had entered the United States
28

illegally that year, and has remained in this country since.  He has never returned to Punjab (or anywhere else in his native country).  Moreover, beginning in 1994, he has been the subject of efforts by the government of the United States to deport him.  While those separate 'removal' proceedings have been underway (for more than ten years now), he has lived (perhaps among other places) in Texas, Ohio, and at least two different places in California.  While it is not clear that the Visa Center knew any of his domestic addresses, it is difficult to understand, given the stipulated facts about Mr. Singh's mobility, how he could contend that it was irrational for the Visa Center to conclude that it could satisfy the requirement to give notice to the alien only in one way -- by mailing notice to the last address the applicant had directly provided to the Center (as opposed to other federal agencies), regardless of how many years had since elapsed, regardless of whether the applicant was being assisted by a domestic lawyer, and regardless of all other information the government had about the applicant's whereabouts or residences.

    As we have pointed out, the authorities command us to use an extremely deferential standard when we are reviewing an agency's interpretation of the statutes and regulations under which it operates.  Given that deferential standard, we HOLD that the Court cannot conclude that Congress intended to permit the Visa Center to give notice to aliens only by one means.  Nor could a rational trier of fact conclude that the Visa Center acted arbitrarily or capriciously when, knowing that the address in Punjab that it had for Mr. Singh might be stale, and knowing that he had been assisted by a lawyer, the Center concluded that the pertinent notices were at least as likely to reach Mr. Singh if they were sent to the lawyer in Houston (where Dharam still lived) as they would be if they were sent to an address in Punjab.

//

//

## CONCLUSION

For the reasons set forth above, the court DENIES plaintiffs' Motion for Summary Judgment and GRANTS defendants' Motion for Summary Judgment.

Judgment shall be entered on plaintiffs' claim for relief under the Administrative Procedure Act in favor of defendants and against plaintiffs.

IT IS SO ORDERED AND ADJUDGED.


Dated:  March 11, 2009                              _____
                                                    WAYNE D. BRAZIL
                                                    United States Magistrate Judge

Copies to:
All parties (via electronic mail)
WDB, Stats.